# Hall *v.* Pennsylvania Railroad Company, Appellant.

*Negligence—Railroads—Injury to live stock—Death of horses—Evidence—Inference from inference—Opinion of witness.*

In an action against a railroad company to recover damages for the death of two horses which were shipped with twenty-two others from Ohio to Philadelphia under a limited .liability live stock contract, the case should not be submitted to the jury, where the evidence showed that the horses were loaded in a proper and usual manner, that they were examined and found in good condition at Pittsburgh and Harrisburg; that there were no marks of injury to the car or to the other twenty-two horses or to the two horses in question, except that one witness saw a little dried blood in the nostrils of one of the horses, that two nonexpert witnesses for the plaintiff without any manual examination of the horses, gave it as their opinion that the necks of the horses were broken, and there was no evidence whatever to show that this condition, if it in fact existed, resulted from any negligent movement of the car.

An inference from an inference is incompetent as proof of negligence.

Argued Dec. 2, 1914.   Appeal, No. 155, Oct. T., 1914, by defendant, from judgment of C. P. No. 1, Philadelphia Co., June T., 1912, No. 856, on verdict for plaintiff in case of Rigdon P. Hall v. The Pennsylvania Railroad Company.   Before RICE, P. J., ORLADY, HEAD, KEPHART and TREXLER, JJ.   Reversed.

Assumpsit to recover for the loss of two horses.   Before KINSEY, J.

The facts are stated in the opinion of the Superior Court.

Verdict and judgment for plaintiff for $252.25.   Defendant appealed.

236   HALL *v.* PENNSYLVANIA R. R. CO., Appellant.

Assignment of Errors—Opinion of the Court.   [60 Pa. Superior Ct.

*Errors assigned* were in refusing to give binding instructions for defendant, and various rulings on evidence.

*Sharswood Brinton,* with him *Spencer Ervin* and *John Hampton Barnes,* for appellant.—There was no case for the jury: Davenport v. Penna. R. R., 10 Pa. Superior Ct. 47; Penna. R. R. Co. v. Raiordon, 119 Pa. 577.

An inference from another inference cannot be tolerated: Douglass v. Mitchell, 35 Pa. 440; McAleer v. McMurray, 58 Pa. 126; Philadelphia City Pass. Ry. Co. v. Henrice, 92 Pa. 431; Bube v. Weatherly Borough, 25 Pa. Superior Ct. 88; Welsh v. Erie & Wyoming Val. R. R. Co., 181 Pa. 461.

*Clinton A. Sowers,* with him *Philip Herrmann,* for appellee: Augustine v. B. & O. R. R. Co., 55 Pa. Superior Ct. 126; Davenport v. R. R. Co., 10 Pa. Superior Ct. 47; Blackburn v. Adams Express Co., 43 Pa. Superior Ct. 276; Schæffer v. Philadelphia & Reading R. R., 168 Pa. 209; Manner v. D. & H. C. Co., 7 Pa. Superior Ct. 135; Rhymer v. Del., L. & W. R. R. Co., 27 Pa. Superior Ct. 345; Delmont v. Adams Express Co., 53 Pa. Superior Ct. 506.

Opinion by Head, J., July 21, 1915:

It is not contended the plaintiff has presented a case which requires or permits the application of the doctrine usually described in the expression "res ipsa loquitur." It is plain the undertaking of the defendant to transport the horses of the plaintiff did not make it an insurer. The plaintiff himself, in his statement, declares the horses were delivered to and accepted by the railroad company under the terms of a special limited liability contract. Giving due effect to these considerations, it becomes manifest the plaintiff's right to recover must depend on his ability to prove, by competent and sufficient evidence,

that the injury of which he complains resulted from some negligent act of the defendant or its servants.

Twenty-four horses were shipped from the State of Ohio to the plaintiff at West Philadelphia, Pa.. The horses, at the time of shipment, were in good condition. They were loaded in a car known as a "Palace horse car," the best kind of a car for the purpose yet devised. This car contained three compartments, a large one at each end and a smaller one in the middle of it. In each of the larger compartments, at the respective ends of the car, ten horses were placed. They were not tied, the testimony indicating they would be packed so closely that each horse would necessarily keep its feet during the journey. In the center of the car there was a smaller compartment which would accommodate four horses. These horses stood tail to tail across the car and each of them was securely tied with a halter with such little lee-way that they could not lie down. When the horses reached Pittsburgh they were unloaded, fed, watered and rested, and then reloaded in apparently the same good condition as when they started. The plaintiff's buyer, who saw them there, next saw them at Harrisburg. He did not travel on the train that transported the carload of horses but on passenger trains so selected that he would have an opportunity to see them at reasonable intervals. When he looked over them at Harrisburg he found all of them to be traveling comfortably, and he then proceeded to West Philadelphia in advance of the train which carried the horse car. When it arrived in Philadelphia he was promptly advised the car had reached its destination and that two of the horses were dead. He notified the railroad authorities to do nothing with the car until he arrived and he went at once, with another witness, and the car was then opened. The two witnesses for the plaintiff looked at the two dead horses, their position in the car, and at the twenty-two surviving horses. As to the latter, they testified that no one of them exhibited a single scratch or mark of any kind, and

they were unloaded in apparently as good condition as they had been loaded in Ohio. The witnesses confined their examination of the two dead horses to looking at them. Owing to the manner in which they were tied, it was not possible for the bodies to assume a fully recumbent position. The hind legs of the horses were drawn under them, either as if, according to the testimony, they had undertaken to lie down naturally or had been shot, hit on the head with an axe, or suffered other such violence as would cause instant death. Upon one of the two horses there was absolutely no external mark or indication of any kind pointing to the cause of its death. As to the other, the witness saw a little dried blood in its nostril. Nothing whatever was observed in the appearance of the car, outside or inside, to point to the fact it had been subjected to any unusual violence, and, as already stated, the condition of the twenty-two living horses excluded the idea they had suffered in any way from any cause. The two witnesses of the plaintiff, who afterwards testified, made no manual examination of the bodies of the dead horses, nor did they attempt to secure the services of any skilled veterinary to determine the immediate cause of their death.

The facts we have thus stated are all of the material facts we can gather from the record that were affirmatively established by the testimony. It is at once apparent there is no direct evidence, on the part of the plaintiff, to prove what caused the death of the two horses; much less any proof that such cause resulted from a negligent act of the defendant or its servants. On the trial the two witnesses of the plaintiff who had visited the car and looked at the horses—neither of whom was a veterinary surgeon—were permitted to give their opinion, from their observation of the facts we have stated, that the necks of both horses were broken and that this was the cause of their death. Whether or not a more careful examination of the bodies, after they were released from the strain of the halters, would have de-

veloped, as an anatomical fact, that the necks were actually broken, is entirely outside of our qualifications to determine. But there was no such proof. If then we are to proceed on the theory that the necks of the horses were broken, we must do so by accepting that as an inference fairly to be drawn from the facts which were proven. Manifestly the plaintiff had not yet reached the crux of his case, namely, to prove that the death of his horses resulted from a negligent act of the defendant.

From the inference, derived as we have stated, that the necks of the horses were broken, the plaintiff then proceeds by opinion evidence to draw, from the first inference so established, the second and to him vital one, namely, that the broken necks resulted from some negligent movement of the car. One of the two witnesses, who saw the bodies of the two horses, describing that they were tied up so closely as to prevent their lying down naturally, said, "Tied up as close as he was with this rope halter—that is what broke his neck—both of them." There is nothing in the evidence to exclude the conclusion that horses, like men, are subject to sudden death from natural as distinguished from violent causes. If by reason of the rupture of a blood vessel in the brain or by some attack upon the heart or its functions, the horses, tied as they were, suddenly sunk in their tracks, might the normal motion of the car result in breaking their necks, if in fact they were broken? Might these horses, by reason of something they had eaten, by any kind of sickness, undertake in their own relief to lie down? In such case could or could not their necks have been broken by the halters and the ordinary swaying of the car? These are questions neither a court nor a jury could answer under the evidence in this case; and they are not suggested in any attempt on the part of the court to ascertain or declare what did in fact cause their death. They are advanced merely to indicate the dangerously insecure foundation on which the plaintiff's case rests.

To undertake to analyze and differentiate all of the

cases that more or less directly bear on the one before us would be wholly impracticable.  Their name is legion. But an attentive examination of many of them clearly impels the conclusion that, if we keep in mind the two legal propositions mentioned at the outstart of this opinion, the plaintiff's case has failed to establish, by competent evidence, the necessary facts upon which alone he can predicate the legal responsibility of the defendant.

The case at bar can be readily distinguished from those on which the plaintiff especially relies.  For instance, in Schæffer v. Philadelphia & Reading R. R. Co., 168 Pa. 209, we quote the following from the statement of facts by the reporter:

"When the car arrived at Fleetwood about 1 a. m. on October 12th, the mules presented every evidence of recent rough handling, as though they had been squeezed together.  Some were bruised internally and externally, some had most of their hair rubbed or tramped off their backs, some had holes in their legs, one had part of his intestines protruding, one was dead, another died the next morning, and another ten or twelve days afterwards."  Is it necessary to point out why the judgment in that case cannot control the one at bar where neither the car itself, outside or inside, nor any one of the twenty-two surviving horses, exhibited the slightest scratch or mark to indicate "recent rough handling"?  It is true, in that case, Mr. Justice FELL said: "Injury to the contents of a car may however furnish ground for an inference of want of ordinary care in transportation:  (cases cited).  There is no reason why this rule with proper limitations should not apply to animate objects."  But it would hardly be contended there can properly be drawn, from such language, the conclusion that whereever a car arrives at destination with any of its contents injured, there is ground for the inference of want of ordinary care in transportation no matter what the nature or extent of the injury be.  To so hold would be to apply

the doctrine res ipsa loquitur to every such case. And it is to be observed that in concluding the same opinion the learned justice says: "It of course would have no application in the case of injuries which are such as animals voluntarily inflict upon each other, or which cannot be accounted for, or which can be satisfactorily explained on any other ground than that of negligence in managing the train; nor in case of death from natural causes, or causes entirely unknown, as in Penna. R. R. Co. v. Raiordon, 119 Pa. 577."

In Delmont v. Adams Express Co., 53 Pa. Superior Ct. 506, this court went as far as any court in Pennsylvania has yet gone, in permitting a jury to infer that the death of an animal, whilst being transported by a carrier, resulted from a negligent act of the carrier. There it was not affirmatively shown what was the immediate and direct cause of the death of the dog, but in addition to the fact of his death the plaintiff was able to prove that the crate in which the dog was confined at the time of his shipment, and which was of special strength, was found smashed at one end. It was because "the physical condition of the smashed crate clearly showed that it had been subject to such violence, rough handling or carelessness in the course of transportation" that the jury were permitted, in the absence of any explanation by the carrier, to infer that the car had been subjected to some external violence. We are unable to differentiate the present case, in principle, from P. R. R. Co. v. Raiordon, supra. In our judgment the reasoning of that case, with that of our Brother PORTER, in Davenport v. R. R. Co., 10 Pa. Superior Ct. 47, requires us to conclude that the plaintiff's case has failed; and that no legal responsibility for the death of the two horses has been fixed by the proof on the defendant. That a legal conclusion cannot be constructed by first drawing even a legitimate inference from facts established by the proof, and then, from such inference, drawing another or several others in a chain of indefinite length scarcely needs the citation

of authorities.   If such be necessary, an examination of the cases of Douglass v. Mitchell, 35 Pa. 440; McAleer v. McMurray, 58 Pa. 126; Philadelphia City Passenger Railway Co. v. Henrice, 92 Pa. 431; Bube v. Weatherly Boro., 25 Pa. Superior Ct. 88,—and a long line of cases in which these are cited and approved—will reveal ample warrant for the conclusion.

Without attempting to consider the evidence offered by the defendant we are of opinion it was entitled to a binding direction, and that having been requested and refused, was further entitled to a judgment n. o. v. in its favor.

The judgment is reversed and judgment is now entered for the defendant.